FILED
2014 Jul-28  PM 06:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **KENNETH W. HUTCHINS,** *for the* | ) | |
| *use and benefit of the United States* | ) | |
| *of America,* | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 10-CV-1525-AKK** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SAFETY-KLEEN SYSTEMS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## BRIEF IN SUPPORT OF THE MOTION FOR SUMMARY
## JUDGMENT FILED BY DEFENDANT SAFETY-KLEEN SYSTEMS, INC.

Christopher F. Heinss
Richard E. Glaze, Jr.
Ginny B. Willcox
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama 35201
(205) 251-8100
Fax (205) 488-5642

## <u>TABLE OF CONTENTS</u>

Introduction……………………………………………...................................1

Facts………………………………………………….....................................2

I.      Hutchins' Employment with Safety-Kleen ......................................2

II.     Hutchins' Allegations .....................................................................3

III.    Background......................................................................................6

IV.     The Contract ...................................................................................8

V.      The Depot's Position on Safety-Kleen's Contract Performance...................14

Legal Argument……………………………………….................................18

I.      Burden of Proof Under the False Claims Act................................18

II.     Hutchins' Failure to Meet His Burden of Proof ...........................21

Conclusion…………………………………………….................................30

**BRIEF IN SUPPORT OF THE MOTION FOR SUMMARY
<u>JUDGMENT FILED BY DEFENDANT SAFETY-KLEEN SYSTEMS, INC.</u>**

Defendant Safety-Kleen Systems, Inc. ("Safety-Kleen") respectfully submits its Brief in Support of its Motion for Summary Judgment against Plaintiff Kenneth W. Hutchins, for the use and benefit of the United States of America ("Hutchins"), as follows:

<u>**Introduction**</u>

Hutchins filed this lawsuit despite knowing nothing about the contract between Safety-Kleen and the Anniston Army Depot (the "Contract") or the billing procedures governing the business relationship between Safety-Kleen and Anniston Army Depot ("the Depot"). Both Safety-Kleen and the Depot have testified that the Contract was performed per the Contract terms. As a material handler who worked exclusively in the warehouse of the Dolomite Branch, Hutchins had no personal knowledge of the Contract terms because he had never been to the Depot, had never seen the Contract, and had never seen billing documents before he filed suit. Rather, Hutchins simply drew faulty conclusions from shipping, inventory, and service documents because he inaccurately assumed that the Contract was a simple solvent sales agreement rather than a machine service/solvent usage agreement.[1] Moreover, even if Hutchins had been able to

---

[1] The typical agreement Safety-Kleen uses is not a per-gallon agreement, but a per-service agreement.

1

form an accurate understanding of a complex agreement he had never seen, there is still no evidence supporting Hutchins' assertion that Safety-Kleen knowingly submitted any false claim or statement to the government. Discovery in this case has revealed nothing to support Hutchins' allegations against Safety-Kleen, and his lawsuit should therefore be dismissed.

## Facts

### I.    Hutchins' Employment with Safety-Kleen

From 2008 until he left Safety-Kleen in February of 2011, Hutchins was the Lead Material Handler at Safety-Kleen's Dolomite facility ("Dolomite Facility") (Exhibit A, Deposition of Kenneth Hutchins, 13:4-9, 29:7-17; Exhibit B, Declaration of Todd Williamson, ¶ 14). In that capacity, Hutchins never saw a copy of the Contract and never saw the invoices and billing spreadsheets Safety-Kleen provided to the Depot, either before or after he filed the Complaint (Hutchins Dep. 39:10-17, 70:3-7, 112:9-22). As Lead Material Handler, Hutchins had never been to the Depot, did not deliver solvent or service parts cleaning machines ("parts cleaners") to customers (including the Depot or any other customers whose parts cleaners were serviced with PD 680II solvent), had no involvement in billing any customer (including the Depot), and had no direct knowledge of how parts cleaners at the Depot were serviced (Hutchins Dep. 42-44, 78:4-16, 79:3-80:12, 119:13-18; Williamson Decl. ¶¶ 7, 14). Hutchins did not

know what amounts Safety-Kleen billed the Depot (Hutchins Dep. 44:13-17, 112:3-8, 114:12-21).

In the process of loading and unloading trucks, Hutchins used load sheets and reconciliation sheets (Hutchins Dep. 32:1-6, 185:14-22). In the process of ordering supplies for the warehouse and conducting physical inventories of warehouse items, Hutchins had access to inventory records (Hutchins Dep. 52:5-55:23). Hutchins did not use service tickets for his job duties, but he copied or removed a number of those documents from Safety-Kleen's Dolomite Branch, which he attached to the Affidavit he filed in support of the Complaint, despite not understanding what the documents meant (Attachments to Complaint, Doc. 1). None of these documents showed how much solvent Safety-Kleen actually provided to the Depot (Exhibit C, Deposition of Todd Williamson 40:21-42:10; Exhibit D, Deposition of Chris Gavin 93:18-23; Williamson Decl. ¶¶ 3, 17).

## II.    Hutchins' Allegations

On June 16, 2010, Hutchins filed the *qui tam* Complaint ("Complaint") (Complaint, Doc. 1). In the Complaint, Hutchins alleges that Safety-Kleen was required under the Contract to deliver to the Depot a specific number of gallons for each parts cleaner Safety-Kleen serviced at the Depot and that the volume of solvent that was allegedly required to be delivered was based upon the solvent capacities of the parts cleaners as denoted in the product identification number for

each parts cleaner listed on daily service tickets (Doc. 1, ¶¶ 12-17). He further alleges he knew that on ten occasions between January 16, 2009 and November 9, 2009, Safety-Kleen fraudulently billed the government for solvent that it was required to, but did not, deliver (Doc. 1, ¶¶ 19-21).

Hutchins alleges Safety-Kleen overbilled the Depot because Safety-Kleen did not completely drain and replace the solvent in parts cleaners it had contracted to service at the Depot (Doc. 1, ¶¶ 19-21). Based on this theory, Hutchins claims Safety-Kleen defrauded the government.

Specifically, Hutchins claims that it took approximately 3,200 gallons of clean PD 680II solvent per week to service the Depot and that Safety-Kleen defrauded the government because the Depot did not receive 3,200 gallons every week (Hutchins Dep. 86:1-87:12 - DX3 ¶ 1-8, 132:10-133:3). Hutchins based his assessment of how much solvent was actually delivered on 1) load sheets and reconciliation forms used for truck loading and offloading; 2) bills of lading that showed the quantities of used solvent that were transported from the Depot after each service day;[2] 3) driver tickets; and 4) his observations (Doc. 1, ¶¶ 19-21;

---

[2] The bills of lading list only the amount of spent solvent that was removed from the Depot on a given service day, and are only useful to show that amount. The quantities listed on the bills of lading have no logical correlation to the amount of solvent actually put into the parts cleaners on a given day or the amount of solvent that was originally in the parts cleaners. This is because: (1) solvent evaporates; (2) when a part is rinsed with solvent, that part is coated with the solvent (just like a person's body after a shower or a swim) and this solvent is removed from the parts cleaner, which naturally depletes the amount of solvent; (3) solvent is frequently removed from parts cleaners to use for other purposes; and (4) the contaminants and sludge cleaned from

Hutchins Dep. 77:4-21, 78:17-80-12, 86:1-87:12 - DX3). Using this information, Hutchins calculated amounts he alleges Safety-Kleen over-charged the Depot on these occasions (Id.). These documents were not, however, used by Safety-Kleen to calculate the amount of solvent delivered and returned from the Depot and were not intended to do so (Williamson Dep. 40:21-41:10; Gavin Dep. 93:19-23; Williamson Decl., ¶¶ 3). They were not intended to show, and do not show, whether Safety-Kleen complied with the Contract or provided the Depot the service it expected to receive from Safety-Kleen (Williamson Dep. 40:21-41:10; Exhibit E, Deposition of Jay McIntosh 77:9-78:15; Williamson Decl. ¶ 3). Moreover, Hutchins used these documents for his calculations without understanding the difference between the service requirements of Safety-Kleen-owned parts cleaners and government-owned parts cleaners at the Depot (Hutchins Dep. 120:1-121:22). The Safety-Kleen-owned parts cleaners were self-cleaning recycle machines and rarely required full replacement of solvent (Williamson Decl. ¶ 12; McIntosh Dep. 74:15-19). This alone made it impossible for Safety-Kleen to calculate how many gallons of solvent were needed to service the Depot in advance of a service visit.

Hutchins further alleges Safety-Kleen placed "contaminated" labels on

---

parts cleaners are heavier than the solvent and drop to the bottom of the parts cleaner, making it impossible to tell from the amount of returned solvent how much is actually solvent and how much is other contaminants – this varies depending on what was being cleaned, how frequently it was being cleaned, and how dirty it was.

drums of clean solvent and conducted inventory adjustments to obscure discrepancies between physical solvent inventory and Safety-Kleen's "book" inventory (Doc. 1, ¶ 22). He believes this is evidence of a conspiracy among Safety-Kleen management to submit and then conceal the alleged "false claims" (Doc. 1, ¶ 23). He has offered no evidence supporting these allegations.

The U.S. Army Criminal Investigation Command ("USACIDC") served Safety-Kleen with a subpoena on May 24, 2011 (three months after Hutchins left Safety-Kleen) that requested a large volume of documents pertaining to Safety-Kleen's contract with the Depot (Exhibit F, Declaration of Joel Leake, ¶ 12). Safety-Kleen completed production of the requested documents in November of 2011, and then heard nothing of substance from USACIDC or the U.S. Attorney's Office after the production was complete (Leake Decl. ¶ 13). Safety-Kleen was unaware that the *qui tam* action had commenced until 2013 (more than two years after Hutchins left Safety-Kleen) (Leake Decl. ¶ 14). The government declined to intervene.

### III.   Background

Safety-Kleen provides cleaning solvent, parts, and related services to companies and government entities throughout the United States (Leake Decl. ¶ 3). Much of Safety-Kleen's business involves servicing parts cleaners used to clean equipment by ensuring the parts cleaners have clean solvent (Leake Decl. ¶ 4). The

company typically charges for this service on a per-service basis rather than charging customers per gallon for the solvent it provides (Leake Decl. ¶ 5). This business model allows Safety-Kleen to retain control of the solvent it provides and to recycle used solvent, thereby reducing waste (Leake Decl. ¶ 5).

Safety-Kleen provides different solvents when servicing customers, including 150 solvent and PD 680II solvent (Hutchins Dep. 41:4-13; 155:16-17; McIntosh Dep. 120:9-121:3). PD 680II typically is used to service parts cleaners used by the government, including government-owned and Safety-Kleen owned machines (Hutchins Dep. 41:10-13; Williamson Dep. 78:3-5; Williamson Decl. ¶ 8). For the time period covered by the Complaint, the Dolomite Facility provided PD 680II to three government entities – the Depot, the Alabama National Guard 187th Fighter Wing, and Maxwell Air Force Base (Williamson Decl. ¶ 9).

A Branch General Manager ("BGM") ran the Dolomite Facility and oversaw its day-to-day operations (Williamson Decl. ¶ 4). The Dolomite Customer Service Manager ("CSM") reported to the BGM, handled Safety-Kleen's relationships with its customers, and managed the Service Representatives, a/k/a Service Technicians (Williamson Dep. 9:8-19, 148:10-149:13 - PX 41; Gavin Dep. 61:23-62:2). The CSM also acted as a BGM when the BGM position was vacant (Williamson Decl. ¶¶ 4-5). The Service Representatives transported solvent to and from customers' locations and serviced parts cleaners at the locations (Williamson Decl. ¶ 6). The

7

Service Representatives recorded that they had serviced each parts cleaner using a hand-held computer, which compiled the recorded services and generated a "service ticket," which showed each machine serviced by the Service Representative during each visit to the Depot (Gavin Dep. 20:12-21:15; Williamson Dep. 26:5-27:3).[3]

The Material Handler and Lead Material Handler worked in the warehouse at the Dolomite Facility and were in charge of loading and unloading solvent and other materials (Hutchins Dep. 29:9-17, 30:5-9; Gavin Dep. 28:22-29:3). The Lead Material Handler was also in charge of counting the physical inventory in the warehouse at the end of each month (Hutchins Dep. 53:5-22, 80:13-17). The Service Representatives traveled to customer locations daily, with the CSM riding along on occasion (Williamson Dep. 109:2-9; Williamson Decl. ¶ 6). Typically, the Material Handlers worked in the warehouse and did not go to the customer locations (Hutchins Dep. 42:17-43:6, 44:13-44:17; Williamson Decl. ¶ 7).

## IV.   The Contract

Safety-Kleen has serviced parts cleaners for the Depot for many years. (Williamson Decl. ¶ 10) Safety-Kleen understood that Safety-Kleen's job was to add or replace PD 680II in the parts cleaners as necessary to enable the Depot to fulfill its mission of maintaining the military equipment for which it is responsible

---

[3] Occasionally, service tickets were handwritten for various reasons, including technical malfunctions (Gavin Dep. 45:12-46:1).

(Williamson Decl. ¶ 10). The Depot likewise believed, based on its observations of the Contract's performance, that Safety-Kleen's job was to keep the parts cleaners full and operating and that it had properly accomplished this objective (Exhibit G, Declaration of Morey Gaddy, ¶ 9; Exhibit H, Declaration of John Patterson, ¶ 9; Gavin Dep. 94:21-95:4). The Contract governed the business relationship between Safety-Kleen from August 1, 2008 through July 31, 2013 (Exhibit I, Declaration of Beth Howard, ¶¶ 1-2; Gaddy Decl.¶ 1).

Under the terms of the Contract, Safety-Kleen was required to service each parts cleaner in accordance with the Contract Statement of Work ("SOW") (McIntosh Dep. 167:17-168:21 - PX 28 RFP 18361, 174:20-175:5). Under the Contract, Safety-Kleen serviced both government-owned and Safety-Kleen-owned parts cleaners (McIntosh Dep. 167:17-168:21 - PX 28 RFP 18361, 74:15-19; Williamson Dep. 19:9-13). For government-owned parts cleaners, Safety-Kleen agreed to provide a "Solvent Cleaning Service" to "[f]urnish all labor, materials, equipment, <u>and perform all services necessary for the servicing</u> **or** <u>solvent replacement</u> of existing parts cleaners in accordance with the attached Statement of Work …" (McIntosh Dep. 167:17-168:21 - PX 28 RFP 18314) (emphasis added). For Safety-Kleen-owned parts washers, Safety-Kleen agreed to provide a "Vat Rental and Solvent Cleaning Service," and specifically, to "furnish all vats … and one 55 gallon drum per month ... [and to] <u>perform all services as necessary for</u>

9

servicing, repair **or** solvent replacement of parts washers" (McIntosh Dep. 167:17-168:21 -PX 28 RFP 18314) (emphasis added).[4]

The Scope of the Contract is set out in Paragraph 1.0 of the SOW, which states:

> 1.1 **SCOPE:** The contractor shall furnish all labor, materials, equipment, and perform all services necessary for the servicing **or** solvent replacement of existing parts cleaners in strict accordance with these specifications.

(McIntosh Dep. 167:17-168:21 - PX 28 RFP 18361, 175:8-19) (emphasis added). The Contract SOW provides a detailed definition of "Servicing" in Paragraph 1.2.2 (McIntosh Dep. 167:17-168:21 - PX 28 RFP 18361, 175:21-177:10). The Contract is never defined as a "solvent sales" agreement and the plain language of the Contract does not require Safety-Kleen to replace unused solvent in the parts cleaners, but instead calls for the replacement only of "spent" solvent.  (McIntosh Dep. 67:17-70:13, 167:17-168:21 - PX 28, 175:8-177:12).

When Safety-Kleen bid on the Contract, Safety-Kleen calculated an average price per gallon for its bid of $4.34 (McIntosh Dep. 52:7-18). This price was calculated to cover the cost of the PD 680II used to service machines, plus other costs inherent in providing services to the Depot under the Contract, including

---

[4] The separate provision for the Safety-Kleen-owned parts cleaners was patterned after the method Safety-Kleen often used for other customers (Leake Decl. ¶ 11). These parts cleaners cleaned the solvent inside the cleaners themselves using a self-contained distillation/recycle unit, which required a less frequent and unpredictable replacement of the solvent (Leake Decl. ¶ 11).

transportation to and from the Depot of personnel and materials, the installation and removal of the PD 680II, other materials used to service the parts cleaners, proper disposal of the spent PD 680II, and the cost of the labor used to replace spent PD 680II in the parts cleaners and clean the machines (McIntosh Dep. 39:13-40:2, 52:7-18). In effect, the "per gallon cost" was a surrogate pricing unit that covered the entire cost of the services Safety-Kleen provided under the Contract (Id.; McIntosh Dep. 51:6-17 - PX 17; Leake Decl. ¶ 10). The Contract was a service contract that included the provision of solvent as part of a service; it was not a solvent sales contract (McIntosh Dep. 69:19-70:13).

Thus, under the Contract terms, Safety-Kleen billed the Depot for the services Safety-Kleen performed under the Contract at an agreed, per-gallon price, based upon the solvent capacities of parts cleaners being serviced under the Contract (McIntosh Dep. 167:17-168:21 - PX 28, 169:9-170:8). This amount varied from year-to-year based on the number of parts cleaners that were added or deleted from the Contract (McIntosh Dep. 16:15-17:5).

Safety-Kleen was not required to fully drain and refill the parts cleaners at the Depot each time it serviced the machines (McIntosh Dep. 167:17-168:21 - PX 28 RFP 18314, 18361, 186:16-22; Williamson Dep. 19:19-20; Gavin Dep. 17:18-18:23). Rather, a service consisted of the replacement of solvent in the parts cleaner if it was spent and, if the solvent was not spent, adding solvent to the parts

cleaner's fill level as needed to fill it to the proper level[5] (Id.). This practice was

consistent with the definition of "Servicing" in the SOW:

> 1.2.2 **Servicing:** Servicing of parts cleaners includes the removal of
> spent solvent[6] and solids, cleaning the washer system, if a washer
> system exists, filling parts cleaner with … solvent per paragraph 6.0,
> and replacing filters, if filters are present on the parts cleaner, if
> applicable and/or necessary. If filters are present on parts washers,
> they may require more frequent replacement than the solvent in the
> parts washer reservoir. Contractor shall evacuate the spent solvent
> from the vats designated into containers suitable for transporation in
> acordance with the Resource Conservation and Recovery Act (RCRA)
> and the United States Department of Transportation (DOT)
> regulations. The Contractor shall service vats on frequency showed in
> government owned vat list Exclosure Table 1. The Contractor shall
> remove all sludge and sediment during servicing. The Contractor shall
> service the parts cleaners without entering the buildings with a truck.
> This may require that the Contractor pump solvent a maximum of 300
> feet. A maximum time of two hours per container shall be allowed for
> servicing. The contractor will provide 16 contractor owned rental vats,
> of various sizes, and service for the same on a regular basis, at various
> locations, as shown in Enclosure Table 2. The contractor will provide
> 12 each 55 gallon drums of solvent per year for usage in Transmission
> test area shown in Enclosure 3.

(McIntosh Dep. 167:17-168:21 - PX 28 RFP 18361) (emphasis added). This

provision shows the Contract was not intended to be a solvent sales contract and

that Safety-Kleen was only required to replace solvent as needed to keep the parts

cleaners full and the solvent clean. Payment under the Contract was based on the

---

[5] At times, Depot personnel would request that Service Representatives service parts cleaners that were not on the list to be serviced when machines that *were* on the list had not been used, and the Service Representatives readily complied.  (Patterson Decl. ¶ 8; Williamson Decl. ¶ 13).

[6] Safety-Kleen considered any solvent that had been used as "spent" and replaced it. (Williamson Decl.11).

totality of the services performed, including solvent replacement, and the other aspects of service as described above (McIntosh Dep. 48:9-50:14, 169:9-171:7, 186:16-22; Williamson Dep. 19:19-20:2; Gavin Dep. 17:20-23).

Safety-Kleen bid, entered into, and performed the Contract as a service-based contract (McIntosh Dep. 69:19-70:13). Specifically, Safety-Kleen serviced the Safety-Kleen-owned parts cleaners and the government-owned parts cleaners at the frequency provided for in Enclosure Table 1 and Enclosure Table 2 in the SOW (Williamson Decl. ¶ 13). While part of the service included replacement of PD 680II in the machines when the solvent was spent, servicing of the parts cleaners also included transportation, machine cleaning, and proper disposal of spent solvent, among other things (McIntosh Dep. 167:17-168:21 - PX 28 RFP 18314, 18361, 186:16-22; Williamson Dep. 19:19-20; Gavin Dep. 17:18-18:23).

When Safety-Kleen Service Representatives serviced a company-owned parts cleaner, they recorded the service on a hand-held computer (Williamson Dep. 167:19-168:3). The hand-held computers were programmed to reduce the company's computer inventory by the entire capacity of Safety-Kleen-owned machines, even though that amount of solvent was not necessarily required to service the parts cleaner (Williamson Dep. 167:19-168:3). This software glitch caused substantial discrepancies between the computer inventory and physical inventory at the Dolomite facility, which required Safety-Kleen to perform

periodic reconciliations of the book inventory with the physical inventory in the Dolomite warehouse (Williamson Dep. 163:16-23, 165:7-166:18). This need to perform inventory reconciliation was not unique to services provided to the Depot under the Contract (Hutchins Dep. 60:5-19; Williamson Decl. 15). Hutchins averred in his deposition that the issue was common among the "branches" (Id.).

Safety-Kleen billed the Depot in accordance with the Contract (Leake Decl. ¶ 9; Gaddy Decl. ¶ 8). While there were some minor billing issues along the way, typical of a complex contract, the Depot called all discrepancies or questions to Safety-Kleen's attention and each discrepancy or question was resolved before the Depot paid the bill, and none were related to overbilling or for services that were not provided (McIntosh Dep. 18:20-19:19; Patterson Decl. ¶ 7; Gaddy Decl. ¶ 7; Leake Decl. ¶ 6). The Depot would not release a payment to Safety-Kleen until any necessary credits or adjustments were properly made (McIntosh Dep. 139:7-10; Gaddy Decl. ¶¶ 7-8).

### V.    The Depot's Position on Safety-Kleen's Contract Performance

Safety-Kleen understood that the Contract obligated it to service parts cleaners at the Depot by replacing used or spent PD 680II and performing other services (such as topping off machines with clean solvent, if necessary, cleaning the machines, transporting the solvent and disposing of spent solvent), but that it did not require Safety-Kleen to remove and replace clean solvent with new, clean

14

solvent (Williamson Dep. 19:19-20:2; McIntosh 39:13-40:2, 41:4-8, 186:16-22; Gavin Dep. 17:9-18:11, 19:23-20:4). This understanding is consistent with the plain language of the Contract (*See* Section III, *supra*). Safety-Kleen had no reason to question this interpretation of the Contract because the Depot closely monitored Safety-Kleen's performance of the Contract and was satisfied with Safety-Kleen's performance (Gaddy Decl. ¶¶ 5-9; Howard Decl. ¶¶ 5-6; Patterson Decl. ¶¶ 4-8; Williamson Dep. 143:17-18; McIntosh Dep. 81:6-82:3; Leake Decl. ¶ 8). This satisfaction on the Depot's part is evidenced by the statements of the Contracting Officer ("CO"), the Contracting Officer Representative ("COR"), and other personnel responsible for supervising performance of the Contract (Id.).

The key Depot personnel involved in administering the Contract were the CO, Beth Howard, the Contracting Specialist, Morey Gaddy, and the CORs, John Patterson and Kathy Till (Id.). As CO, Ms. Howard oversaw general administration of the Contract, including approval of the Contracting Specialist's payment of the invoices, reviewing Contract modifications, and providing assistance to the Contracting Specialist as requested (Howard. Decl. ¶ 3). Mr. Gaddy was in charge of ensuring that Safety-Kleen correctly billed the Depot and that the Depot correctly paid the invoices (Howard. Decl. ¶ 2). The CORs (Ms. Till and Mr. Patterson) were the "eyes and ears" for the government for day-to-day operations (Patterson Decl. ¶ 3).

15

Mr. Patterson and Ms. Till were very diligent in their day-to-day oversight of the Contract (Howard Decl. ¶ 5). Each time Mr. Gaddy received Safety-Kleen's invoice documentation, he reviewed the total amount charged and sent it to the COR to be reconciled with the terms of the Contract (Gaddy Decl. ¶ 5; McIntosh Dep. 81:6-82-3). The COR verified the invoices by reconciling them with service tickets (which listed the machines serviced) and the spreadsheets Safety-Kleen submitted to the Depot with the invoices (Patterson Decl. ¶ 6). The detailed reconciliation often required the Depot to clarify discrepancies with Safety-Kleen. Safety-Kleen and the Depot worked collaboratively, diligently, and thoroughly to resolve all discrepancies (Gaddy Decl. ¶ 8; Patterson Decl. ¶ 7; McIntosh Dep. 67:13-19, 108:2-8, 117:11-22; Leake Decl. ¶ 7). Thus, all billing discrepancies were resolved in a manner that ensured that the Depot did not pay more under the Contract than it was obligated to pay (Gaddy Decl. ¶¶ 7-8). There were no serious billing issues with the Contract that were not ultimately reconciled. (Id.).

CO Howard and Contracting Specialist Gaddy stated that, after all billing reconciliations had been agreed upon by the Depot and Safety-Kleen, the Depot never paid Safety-Kleen more than it was required to pay for the services Safety-Kleen provided (Howard Decl. ¶ 6; Gaddy Decl. ¶ 8). The Depot verified the invoices and the COR verified that Safety-Kleen performed the services in accordance with the Contract terms by observing Safety-Kleen's servicing of the

16

parts cleaners and by performing inspections at the Depot (Patterson Decl. ¶¶ 4-8).

Because the CORs could not continuously monitor the work in the Depot shops, they relied on Depot shop supervisors to report service problems (Patterson Decl. ¶ 4). If the CORs noted or became aware of any deficiencies, they were responsible for reporting any deficiencies to the CO (Patterson Decl. ¶ 5). Problems were infrequent and any issues were resolved immediately to the Depot's satisfaction (Gavin Dep. 94:21-95:4; Gaddy Decl. ¶ 9; Patterson Decl. ¶ 9).

The Depot also verified that Safety-Kleen was performing in accordance with the Contract by signing the daily service tickets (Patterson Decl. ¶ 8). The Depot was pleased with the services Safety-Kleen provided and, aside from the aforementioned isolated incidents that were quickly reconciled, the Depot received the services it expected under the Contract (Gaddy Decl. ¶ 9; Patterson Decl. ¶ 9; McIntosh Dep. 51:1-5). There was no dispute between the Depot and Safety-Kleen about whether the terms of the Contract were complied with (Id.).

Even if Hutchins was correct in his assumption that the Depot received less solvent than the Contract called for, the undisputed evidence shows that Safety-Kleen believed it was performing as required by the terms of the Contract and that the Depot was satisfied with Safety-Kleen's performance (*See supra*).

17

## Legal Argument

### I.   Burden of Proof Under the False Claims Act

This case is purely a False Claims Act case, which is the only cause of action pled. The False Claims Act ("FCA") permits a private individual to file a civil action against, and recover damages on behalf of the United States from, any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government … a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a)(1-2). "'Knowingly' means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth of the information, or acted in reckless disregard of the truth of the information" *Id.* § 3729(b); *U.S. ex rel. Kaimowitz v. Ansley*, 250 F. App'x 912, 914-15 (11th Cir. 2007) (affirming Summary Judgment granted to Defendant due to lack of evidence supporting Plaintiff's "speculative allegations" of a false claim).

To establish a cause of action under the FCA, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *Ansley*, 250 F. App'x at 915 (citations

omitted). "The law is settled in this Circuit that to show a violation of the False Claims Act <u>the evidence must demonstrate</u> 'guilty knowledge of a purpose on the part of [the defendant] to cheat the government' or 'knowledge or guilty intent.'" *U.S. v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (Former 5th Cir. 1972) (citations omitted) (emphasis added); s*ee also Farrell v. Busey Bank*, 2010 WL 4342059 at *1 (M.D. Fla. Oct. 7, 2010) (dismissing claim under the FCA because Plaintiff "failed to show that any false claims were presented to a government agency <u>where presenter knew that the claim was false</u>.") (emphasis added); *U.S. v. Holy Cross Hosp., Inc.*, 2007 WL 2480236 at *5 (S.D. Fla. Aug. 29, 2007) (granting Summary Judgment on claims asserted under the FCA, stating "[w]hile mistakes in submitted claims may violate Medicare/Medicaid regulations, <u>for civil liability under the False Claims Act, 'knowledge' of the falsity of the claim or fraudulent nature of the claim must be shown.</u>") (emphasis added).

Federal courts have disallowed the use of a "collective knowledge" theory, which would permit a Plaintiff "to prove scienter [under the FCA] by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claims seeking government funds." *U.S. v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1275 (D.C. Cir. 2010) (vacating and remanding for new trial because of faulty jury instruction permitting the jury to apply a

19

"collective knowledge" theory to prove scienter under the FCA) (quoted favorably in criminal context by the Eleventh Circuit in *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1245 n.8 (11th Cir. 2013)). The D.C. Circuit explained, "We nonetheless believe that under the FCA, 'collective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of constructive knowledge that is inconsistent with the Act's language, structure, and purpose." *Sci. Applications*, 626 F.3d at 1274.

Frequently, Plaintiffs will improperly attempt to "shoehorn" a breach of contract claim into a claim that is cognizable under the FCA. Federal courts have universally rejected such attempts. *U.S. v. Basin Elec. Power Coop.*, 248 F.3d 781, 794 (8th Cir. 2001) (reversing trial court's judgment under the FCA, stating, "the mere misinterpretation of a contract cannot be the basis of a False Claims Act violation."); *Sci. Applications*, 626 F.3d at 1271 ("Strict enforcement of the FCA's scienter requirement will also help to ensure that ordinary breaches of contract are not converted into FCA liability."); *U.S. ex rel. Costner v. U.S.*, 317 F.3d 883, 888 (8th Cir. 2003) (affirming dismissal of action brought under the FCA, stating, "[S]imple contract breaches … cannot provide evidence of a knowing violation of the [False Claims] Act.") (citation omitted); *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 (7th Cir. 2011) (affirming Summary Judgment for

Defendant, stating, "[A] mere breach of contract does not give rise to liability under the False Claims Act.") (citation omitted); *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (affirming Summary Judgment for Defendant, stating, "'[t]he FCA is a fraud prevention statute.' It does not allow a *qui tam* relator to 'shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act.'") (citations omitted); *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 373 (4th Cir. 2008) (affirming Summary Judgment for Defendant):

> Since initiating this litigation, Relators have consistently sought to shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act. This misguided journey must come to an end. If every dispute involving contractual performance were to be transformed into a *qui tam* FCA suit, the prospect of litigation in government contracting would literally have no end.

## II.   Hutchins' Failure to Meet His Burden of Proof

Hutchins has proffered no evidence, and discovery has revealed no evidence, that Safety-Kleen knowingly submitted any false claim to the government. Such is Hutchins' burden of proof under the False Claims Act, and he has completely failed to uncover anything to support the uninformed and speculative allegations that comprised his Complaint.

First, Hutchins had never been to the Depot and had never seen the Contract

before he filed the Complaint, and his lack of knowledge of the facts led him to assume that contract performance was measured by counting gallons. Although he believed that the Contract was a simple solvent sales contract, the Contract language shows, and testimony from Safety-Kleen personnel further explains, that the Contract was a service-based agreement. Thus, the entire theory that supports Hutchins' claims has been negated through discovery.

Although perhaps not perfectly drafted, the mission underlying the Contract was to assure the Depot had functioning parts cleaners that were reliably full of clean solvent so the Depot could maintain and repair equipment and weapons being used in Iraq, Afghanistan, and other military theaters. It is undisputed that Safety-Kleen kept the parts cleaners full of clean solvent and thereby fulfilled this mission (Patterson Decl. ¶ 9). In short, during the pendency of the Contract, Safety-Kleen ensured that the Depot had working parts cleaners full of clean PD 680II.

Even if Hutchins could establish that the Depot did not receive the number of gallons it expected to receive under the Contract, this would not sustain his claims under the FCA, because there is no evidence that Safety-Kleen knowingly submitted false claims to the government. Hutchins has vaguely identified certain conversations he had with other Safety-Kleen employees and, because there is no other evidence he can use, Safety-Kleen expects he may rely on these

conversations in his attempt to establish scienter. It is questionable whether the conversations occurred as Hutchins claims and, even if they did, they are of questionable evidentiary value, and they neither support the unwarranted conclusions Hutchins draws from them nor show any impropriety on the part of Safety-Kleen.

First, Hutchins alleges that a "vac truck" driver named Winfred Moon, whom Hutchins was uncertain ever went to the Depot, told Hutchins that there had been some billing problems between Safety-Kleen and the Depot (Hutchins Dep. 64-71). In addition to being inadmissible hearsay, this statement is irrelevant because Moon did not service the Depot, did not have any knowledge of the Contract, and did not know how the Depot was billed (Williamson Decl. ¶ 16).

Second, Hutchins refers to vaguely recalled conversations with BGM Jim Faust in which he alleges that Faust told Hutchins that there had been occasions in which Safety-Kleen had given the Depot a refund, and that Faust "felt like they was getting over on the Depot" because they could put only two gallons of solvent a parts cleaner, but yet could bill the Depot for a 45 gallon service (Hutchins Dep. 217-18). Apart from the vagueness of Hutchins' description - even taken at face value - the content of the alleged conversation only shows Faust knew of some of the aforementioned minor billing issues with the Contract, which, as the undisputed evidence shows, were not related to allegations by the Depot that

Safety-Kleen purposefully incorrectly billed the Depot and that Faust understood the Contract to be a service-based rather than a gallon-based agreement. Even if Hutchins correctly recalled his alleged conversations with Faust, they add nothing to support Hutchins' allegations against Safety-Kleen.

Third, Hutchins refers to a meeting with HR Manager Mike Huelett followed by a subsequent meeting between Hutchins and four Safety-Kleen managers (including John Creed, Jim Faust, Barry Miller, and Huelett), where Hutchins allegedly reported concerns he had about inventory irregularities in the warehouse (not pertaining specifically to the Depot) (Hutchins Dep. 214-17). In the process, Hutchins tries to bolster his FCA claim with evidence that the Dolomite facility's physical inventory often did not match the facility's "book" inventory. He believes this routine inventory reconciliation is evidence of a fraudulent scheme to deprive the Depot of solvent to which it was entitled. Instead, the admitted mismatch between book inventory and physical inventory, which required routine hand counting of inventory, was necessary because of a software function in hand-held devices used by Safety-Kleen to record services performed at the Depot <u>and</u> for other customers. The devices, a perennial headache for Dolomite, automatically reduced the company's computer inventory of solvent by the maximum gallon capacity of a machine each time the machine was serviced and, as described above, the Contract for the Depot and contracts for other customers were not based purely

on gallons of solvent provided (Williamson Dep. 166:15-167:3). After learning of Hutchins' concerns regarding the need to perform physical inventories, management investigated, was comfortable that the complaint was unfounded, and told Hutchins the issue was being addressed through reconciliation (Exhibit J, Declaration of John Creed, ¶ 3). In short, Safety-Kleen looked into Hutchins' concerns, determined that nothing improper was occurring with inventory and, because the issue was outside the scope of Hutchins' job responsibilities, advised Hutchins to carry on with his normal job duties without sharing every detail of the company's inquiry.[7] Hutchins has wrongly interpreted this as evidence of a cover-up, perhaps because he was offended by not being party to the entire inquiry.

Finally, Hutchins referenced a conversation with John Creed, a Safety-Kleen district manager, who, in response to Hutchins' complaints about operational problems, said "that's just the way it is sometimes." Creed understood Hutchins' concerns to be about the inventory count in the warehouse (Creed Decl. ¶ 5). Because Creed understood that the inventory hand counts were a normal part of

---

[7] The physical inventories were done in the normal course of Dolomite operations and do not indicate an attempt to obscure misconduct, as Hutchins himself acknowledged in his deposition. (Williamson Decl. ¶ 15; Hutchins Dep. 60:5-19).  Had the inventories indicated some sort of improper conduct, it would not have been reasonable for Safety-Kleen to conduct the periodic reconciliations openly, during business hours, without regard for who knew they were occurring. Likewise, the data from the hand-helds and bills of lading were shared openly with the Depot, the entity Hutchins accuses Safety-Kleen of defrauding.  (Patterson Decl. ¶ 6; Gavin Dep. 22:3-15).  If this data was indeed written documentation of fraud, as Hutchins suggests, it would not have made sense to share it.

business operations, Creed told Hutchins not to worry about the issue because it was outside the scope of Hutchins' job responsibilities and was being appropriately handled by the appropriate Safety-Kleen personnel (Id.).

In short, Hutchins formed assumptions about what these ambiguous statements meant, but his assumptions neither naturally arise from the conversations about which he testified, nor are they supported by the facts in the record. The conversations evidence no sinister intent by Safety-Kleen. Because none of the statements establish that Safety-Kleen was knowingly presenting false claims to the government, and because Hutchins' beliefs about the conversations are not facts, the conversations are irrelevant to this decision. Even construing Hutchins' allegations in the most favorable light, Hutchins cannot piece the statements together to prove that, collectively, the statements establish scienter, because the "collective knowledge" theory cannot be used to establish scienter under the FCA. *Sci. Applications*, 626 F.3d at 1274-75.

In contrast to the vague statements Hutchins relies upon, the three witnesses Hutchins deposed in this case, Chris Gavin (a former Safety-Kleen Service Representative who serviced the Depot), Jay McIntosh (one of Safety-Kleen's corporate representatives), and Todd Williamson (the CSM at the Dolomite Branch and Safety-Kleen's other corporate representative) stated that Safety-Kleen's performance under the Contract paralleled the document's plain language and,

accordingly, that the parts cleaners at the Depot were serviced to the Depot's

satisfaction. Mr. Gavin, who is no longer employed by Safety-Kleen, and has no

stake in this litigation, testified as follows:

> Q: … My question is – and I'm specifically talking about your time
> servicing Anniston Army Depot – to the best of your knowledge, each
> time you went to the depot, did you fully service each machine that
> way that you had been trained to do it?
> **A: Yes.**
> Q: Were there ever times that you indicated on paperwork that you
> had serviced a machine and yet you actually hadn't done it?
> **A: No.**
> Q: Was there ever any time that anyone at Safety-Kleen suggested
> that you should do such a thing?
> **A: No.**
> Q: Other than the one time you indicated that you and Todd
> Williamson went back out to investigate a complaint, are you aware of
> any other complaints while you were at the Dolomite branch that
> Anniston Army Depot made about the servicing of machines at the
> Anniston Army Depot?
> **A: No.**
> Q: Whether you or anyone else?
> **A: No.**
> Q: And are you aware of any other employee of Safety-Kleen who
> went to the depot and didn't service a machine and yet indicated on
> paperwork that they did?
> **A: No.**

(Gavin Dep. 94-95).

There is no evidence to contradict Safety-Kleen's understanding of the

Contract. Even if there were evidence that Safety-Kleen did not perform in

accordance with the Contract, which there is not, Safety-Kleen cannot be shown to

have the scienter required to convert a breach of contract matter into a fraud, in

violation of the FCA. *See Sci. Applications*, 626 F.3d at 1271 ("Strict enforcement

27

of the FCA's scienter requirement will also help to ensure that ordinary breaches of contract are not converted into FCA liability.").

Even if Hutchins could establish scienter under the FCA, which he cannot, he still cannot prove damages. It was apparent in his deposition that Hutchins had no idea how the damages described (under oath) in his Affidavit were calculated:

> Q: Okay. Well, let me ask you this: Given the calculations that are on the spreadsheet, Exhibit D [to Hutchins' Affidavit], do any of the documents that are attached help give you the specifics as to how this particular spreadsheet was populated, the numbers and the names and stuff that got in there:
> **A: I didn't do it, so I –**
> Q: Yeah.
> **A: -- wouldn't know.**
> Q: And I may be – I don't want to waste our time. For lack of a better way of putting it, do you have any clue how these calculations came together?
> **A: I didn't do it, so I wouldn't know.**
> Q: Okay.
> **A: I –**
> Q: And so, when you signed that paragraph, your affidavit had a paragraph specifically relating to these calculations, which is paragraph 11?
> **A: Talking these –**
> Q: Yeah.
> **A: -- numbers here?**
> Q: Yeah. Yeah, this is what paragraph 11 specifically talks about in Exhibit D. I guess what I'm asking is, did you know what you were signing when you signed the affidavit with paragraph 11 in it?
> **A: I don't know anything about this. This is what I'm – what I'm saying.**
> Q: Okay.
> **A: I – I didn't do this – this sheet.**

(Hutchins Dep. 183-84). Tellingly, Hutchins named no forensic accountant or other

expert who can testify that the Depot suffered any measurable damages.

Again assuming that Hutchins could establish that Safety-Kleen failed to provide to the Depot what was required by the Contract and could even prove the requisite scienter under the FCA, which he cannot, he also cannot prove that the Depot suffered any material damages.  It is un-contradicted that the Depot's parts washers were maintained with the amount of clean solvent called for in the Contract during the entire term of the Contract. Thus, not only can Hutchins not quantify the allegedly omitted solvent quantities, he cannot demonstrate that by omitting the quantities, the Depot was materially damaged. As the facts indisputably show, Safety-Kleen provided the services needed by the Depot to fulfill its mission. Under the FCA, "[t]o establish damages, the government must show not only that the defendant's false claims caused the government to make payments that it would otherwise have withheld, but also that the performance the government received was worth less than what it believed it had purchased." *Sci. Applications*, 626 F.3d at 1279. Hutchins cannot meet this threshold test. Therefore, no breach or omission identified by Hutchins, even a knowing one, was material. An immaterial matter – where the government was not meaningfully harmed – cannot form the basis of an FCA claim. *U.S. ex rel A+ Homecare v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir. 2005) (imposing a materiality requirement as an additional *prima facie* element in FCA cases); *see*

*also U.S. ex rel Stephens v. Tissue Sci. Labs, Inc.*, 664 F. Supp. 2d 1310, 1317-18

(N.D. Ga. 2009) (adopting the materiality element, noting that where the false

claim is irrelevant to the government there can be no FCA liability.[8]

## Conclusion

In sum, Hutchins' case fails at every turn: (1) he was incorrect in his

understanding of the terms of the Contract, which he had not seen before filing

suit, and he cannot show Safety-Kleen failed to perform in accordance with its

terms; (2) even if he had been correct in his understanding of the Contract, there is

no evidence to support his burden of proof that Safety-Kleen knowingly submitted

false claims to the government; and (3) even if he had evidence to show false

claims were knowingly submitted, he cannot prove damages, either with data or by

expert testimony, nor can he establish that any such damages were material.

For these reasons, Hutchins' claims against Safety-Kleen are due to be

dismissed.

Respectfully submitted this 28th day of July, 2014.

s/Christopher F. Heinss
One of the Attorneys for Defendant,
Safety-Kleen Systems, Inc.

---

[8] "The materiality requirement for FCA claims is well-established." *Tissue Sci. Labs, Inc.*, 664 F. Supp. 2d at 1316. Although, the Eleventh Circuit is one of the Circuits that has not addressed the materiality requirement, the First, Fourth, Fifth, Sixth, Eighth, and Ninth Circuits have adopted the materiality requirement. *Id.* Only the Third Circuit, in dicta, has cast doubt on the materiality requirement. *Id.*

**OF COUNSEL:**

Christopher F. Heinss
Richard E. Glaze, Jr.
Ginny B. Willcox
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama 35201
(205) 251-8100
Fax (205) 488-5642

## CERTIFICATE OF SERVICE

I certify that on July 28, 2014, I electronically filed a copy of the foregoing

with the Clerk of Court using the CM/ECF system, which will send notification of

such filings to the following:

William M. Acker, III
Thomas B. Talty
2015 First Avenue North
Birmingham, Alabama 35203
(205) 458-1154 (Mr. Acker)
(205) 458-1111 (Mr. Talty)

s/Christopher F. Heinss
OF COUNSEL